Mr. Rothfeld? Thank you, Your Honor. May it please the Court? I am Charles Rothfeld, Mayor Brown. I represent the defendant, Pellant, Freight Bulk. This case presents a question of admiralty jurisdiction, and the background is simply stated. The plaintiff here, FLAME, on a judgment in English court against a third party called ICI for breach of derivative contracts called Forward Freight Agreements. FLAME then registered that English judgment in the Southern District of New York, registered in turn the New York judgment in Eastern District of Virginia. FLAME now takes the position that my client, Freight, is an alter ego of ICI, and it is attempting to enforce its English judgment against Freight Bulk by the invocation of the Admiralty Attachment Rules to attach a vessel of freight in Virginia. The District Court said, and we think correctly and we agree, that the attachment can go forward only if there is admiralty jurisdiction in the District Court. Where we part company with the District Court is that we think that there was no admiralty jurisdiction, and that is so for two independent reasons. First is that the underlying English judgment that FLAME seeks to enforce was not regarded as maritime under the law of England where the judgment was issued, and it is the U.S. rule that for U.S. maritime purposes, a judgment takes the character that it's given by the foreign court that issued it. If that's correct, then what was the basis of the Southern District of New York's recognition of that judgment? Do you quarrel with that? We don't quarrel with the fact that a foreign judgment can be registered in the United States. The question is whether for the purpose of this proceeding, it has to be an admiralty proceeding for the attachment to go forward. The question was, was it proper for that court to recognize it implicitly, I guess, assuming that it was a maritime judgment? Well, I think if it had to have been a maritime judgment for it to have been recognized, then I would say the answer to that is no. Had the action gone forward on a diversity basis in New York, and so they were simply applying the ordinary recognition rules, then like any other foreign judgment, it couldn't be recognized. Judge Diaz's question leads into another question. If the district court in New York had not given force to the English judgment, it would not have been following the Second Circuit's own decision in Blue Whale, and if we were to say that English law rather than federal law is controlling in determining whether something is maritime in nature, would we be setting up a conflict with the Second Circuit and its Blue Whale decision? I think it would not be a direct conflict for this reason. What we regard as quite an important part of the analysis is that we are talking about the recognition of a foreign judgment where there are very significant comedy values that are at stake. In the Blue Whale case, there was no foreign judgment. It was sort of an anticipatory attachment that was thought to be made in advance of a judgment in England, so there was no judgment at that point. So I think there would be tension, I have to acknowledge. There would be some tension between the Second Circuit's view and the Fourth Circuit's view if we were to take your position. The Second Circuit said it was pretty clearly, and the question was squarely presented to it, that federal law rather than foreign law controls. Now, that doesn't mean that in determining the content of federal law that you don't take into account as one factor in deciding whether something is maritime or how you get to the whole question of maritime. It seems to me you can, throughout this problem, you can consider what English law is with respect to maritime claims, but it seemed to me your position was that we were to accord controlling effect to the law of a foreign jurisdiction and determining the subject matter jurisdiction of the courts of the United States, and whereas I do think a foreign, you know, the character of a foreign judgment and the characterization of whether something is maritime under English law is certainly a relevant consideration. The admiralty jurisdiction is something that's, you know, set forth in Article III of the Constitution. And I think that the federal, there's no question federal law governs the jurisdiction of the federal courts, but I think the federal rule here embodies as an aspect of its rule of decision what the foreign law is in this context. And I guess let me, I should say two things about this. First on whether or not this court's rule would be in tension with that of the Second Circuit. We think this court has already decided this issue in our favor in the Vital case, which Judge Agee wrote for the court. Why do you say that? Because in a circumstance that was essentially identical to the one here, what was the character of a foreign judgment? The court looked exclusively to the nature of the English judgment as a matter of English law, and the court said that what is the… The issue that was raised in that case was whether the sole claim that was made was that jurisdiction based on the choice of the forum in England was determinative. And we held in the Vital case, no, that wasn't determinative. The issue that we have here on whether federal jurisdiction controls was never raised. But I think I would have to say that the court's conclusion in the Vital case was that the judgment was a maritime judgment, and in deciding that question, it looked exclusively to the characterization of the judgment as a matter of English law. I'm not sure you can say that based on the language of the opinion. S&P in that case, which is similarly situated to you here, and I want to read from the opinion, asked the court to hold that the choice of forum in England, not the subject matter jurisdiction of the underlying claim, is dispositive of whether jurisdiction lies with the district court. And then a few sentences later, we say, indeed, the dispositive question is not whether the English judgment issued from an admiralty court, but rather whether the claim itself is maritime in nature. And I think reading further from the court's opinion, maritime, as that term was understood by the courts of England, so I think it looked exclusively, again, I'd like to hear. Well, there was no argument on that. It was purely what was the choice of forum in England make a difference as to whether or not you could treat it as a maritime claim. That is true, but I certainly won't instruct the court on what it meant in that decision. But at least as I read it, for there to be jurisdiction, the court had to have made a determination that there was, in fact, maritime. But you are courting, as I see it, controlling effect to English law. And you're going awfully far down that road, and I just think you're asking this country to cede control over international shipping arrangements to some categorical rule that foreign law applies. Yes, that's where the implications are. You're asking for us to make a major concession in saying international law applies, foreign law applies. You diminish the role of American law and federal law, which might take account of foreign law, to be sure. It's not as if it's irrelevant. It's not. It's a factor. But I just feel like we are just essentially surrendering something of significant international importance to the characterizations of foreign courts. Now, the problem is it may seem clear in this case that English law does not regard this contract as maritime. Let's just say you're right about that, that English law regards this contract not to be maritime in nature. But a lot of times, it's going to be very difficult to determine exactly what the content of the federal law is. I mean, I don't know how many countries there are around the globe, but there are a whole lot of them. And I don't think we can get into the box of allowing every single country around the globe and its characterization of something as maritime or non-maritime in nature to be controlling the admiralty jurisdiction of United States courts. That's a terrible box to be in. If I may, I'll make one response to that, and then I'll turn to the other issue in the case, looking at this in terms of U.S. maritime law. The rule that we are advocating is one that has been applied by the federal courts consistently since the adoption of the Constitution. We talk about this at some length in our briefs, and the court in the Vital case cited some of this authority. It has always been the rule stated by Justice Iredell in 1795, which he said even at that point was a longstanding rule, that the admiralty courts of one nation have the authority to carry into force the judgments of other admiralty courts. But isn't that what we're doing here? I mean, if you're worried about comity in international relations, doesn't the comity lie in enforcing the English judgment? Because that's what the district court in New York and that's what the district court in Virginia were both doing. They were asserting the jurisdiction of the federal courts to give effect to the English judgment, and so that respects what happened in the other country. Well, if I may, I think what we're talking about is applying an admiralty-specific rule, the attachment rule. It's not a question of enforcement of the judgments in the general sense. This is whether this is an admiralty case. When the courts consistently, going back to Justice Iredell and beyond, have said that admiralty courts in one nation will enforce the judgments of admiralty courts in another nation, we are recognizing the admiralty status of the foreign nation's court, and as the court said in Feudal, whether it's an admiralty court or it's simply exercising admiralty law under that nation's law, it doesn't make any difference. Well, there is broad language, if you're right on that, on a lot of the historical cases, but I don't think there was any case that was sideward. The issue that's raised here, the conflict between federal law and foreign law, was a determinative issue. It is, and I'm not aware of it. In the Campeche case from the Fifth Circuit, which this court discussed in Vital, we sort of had to convert it. There was a case in which the court said, we will enforce the admiralty judgment of a foreign nation in our admiralty court as a matter of maritime law, even though this is not a maritime, we as U.S. courts, as an initial matter, would not regard this as a maritime case. We will give comity to the determination that it is admiralty because it was decided by an admiralty court in a foreign nation. So I think that this is, again, something which has been the rule. Doesn't that still come too close to saying that the jurisdiction of the courts of the United States will be determined by the characterization of another country? Isn't that where you're trying to lead us? I think that, as I say, this is a rule which predated the adoption of the Constitution. It predated the enactment of the first admiralty statute. And there is nothing extraordinary, as we also cite in our brief, in federal law embracing incorporating standards that are stated either by state law or by foreign law for jurisdictional reasons. That's simply what the rule here, which has been enforced since the 1790s, is that as a matter of admiralty law, when we are talking about enforcing the judgment of a foreign nation, we will accept the characterization of that judgment given by that nation's courts as a matter of comity, just as we would like English courts to respect our characterization of judgments that are issued by U.S. admiralty courts, either as being or not being admiralty cases. The district court relied somewhat heavily on the Supreme Court's decision in Norfolk Southern v. Kirby, which did not involve this issue, but there was fairly broad language in there about the primacy of federal law. And the touchstone in maritime cases was whether or not we would have a uniform application of maritime law in the United States. And it seems like to me that if we adopted your position, we'd have anything but a uniform application in this circumstance, because you'd have an application dependent upon how many different countries there were in the world that someone wanted to enforce their maritime judgment. But I think that is not so, Your Honor. We agree that uniformity is a very important principle as a matter of admiralty. But what the court was talking about in Kirby was rules that govern primary conduct. People are not subject to different obligations in different places, depending upon rules of different states or different nations being applied to them. Here, we're talking about the characterization of a singular single judgment issued by a single foreign court. But foreign judgments, they don't say, and they don't have it, this is a maritime judgment, this is not a maritime judgment. You often have to do a little digging and scratching to find out, if you could ever find out what the characterization by another country of its judgment was. I think Judge Agee's point is right on, because what you do is you'd have all kinds of inconsistent judgments in this country about what is maritime and what is not, when admiralty jurisdiction attaches and when it doesn't, and when state courts enter the picture and everything. It seems to me you're going to establish the most confusing quiltwork in this whole area. As Judge Agee points out, the whole purpose of Congress, when it framed the United States Constitution, it gave the federal courts jurisdiction in maritime matters and in admiralty. And on the one hand, that has a dual significance, because on the one hand, it didn't want to cede the admiralty cases to the state courts. And on the other hand, it wanted to preserve Congress's authority to prescribe, if it wanted to, through rules, statutes, or leave to judicial decision, a set of rules for admiralty cases. It would be somewhat uniform in nature. And we're sort of undercutting the purposes of that whole jurisdictional grant with what you're proposing. Well, Your Honor, we address that in our briefs, and I've been talking about it for a long time here. And I see that my time has essentially expired. Do you have something else? If I could make a brief comment about the second issue, an entirely separate, independent issue in the case, which is a separate and independent reason why we think that we should prevail, why there is no admiralty jurisdiction, is that even entirely disregarding English law, looking at these forward freight agreements under U.S. maritime law, we think that they are not maritime contracts. The rule that governs, as was stated by the Supreme Court in Kirby, a contract is maritime if its primary purpose is maritime commerce. That means, as the Fifth Circuit said in the Alphabet case, that the contract has to be directed to the operation of a boat, to its navigation, to its management afloat. These FFAs, forward freight agreements, do not do that. They have nothing to do with particular ships. They have nothing to do with – Was this contract a contract between – were the parties to the FFA here contracts between shippers or shipping entities? They were between a broker and a shipping entity. I mean, if it were purely a sort of speculative contract between two brokers with no connection to shipping, that might be something else, but doesn't this have a connection to shipping? Well, I'll make two points in response to that, Your Honor. First, we think that FFAs never, even when they are between shipping entities, are not maritime contracts because they have nothing to do with particular ships, particular voyages, particular cargo. Essentially, they are derivatives. They are bets on the direction of market indices that track – They're derived solely from maritime commerce. But they are not – they have no connection to any particular vessel, any particular ship. But the purpose is to facilitate the carriage of goods on a ship. Well, sometimes it may be, and sometimes it's not. Well, I guess – let me take a step back. I would say that an FFA may – That counteracts your first argument, if you say that. I'm sorry, Your Honor? I said what you just said counteracts your first point. I don't think so, Your Honor. I think there are two aspects of the FFAs that are relevant here. One is that they never are related specifically to any voyage, any ship. And as we understand what the Supreme Court said in the Kirby case, what all the lower courts have said interpreting Kirby, there has to be some connection to the operation or management of a particular vessel for the contract to be maritime in nature. And FFAs never fall into that category, even if they are used for hedging purposes. Aren't there a number of at least district courts in New York and Texas and Louisiana, all of which have courts and have admiralty courts, have admiralty cases on a regular basis that have found FFAs to be maritime in nature? And as we show in our brief and our reply brief, Your Honor, I think almost all of these cases have misunderstood the nature of FFAs. They have understood the FFAs to be an agreement to transport a particular cargo on a particular ship in the future. That is simply not what they are. And I think Flame has abandoned that as a defense of the judgment below because that is simply not what FFAs – the record is quite clear in this case that FFAs are derivatives that are based on market indices that track the movement of freight prices in the aggregate. Here again we run into the same problem we were running into with the first issue, which is if you say these are not maritime in nature, you are constricting admiralty jurisdiction and the kind of uniformity that Congress wanted to achieve with respect to it. Because a lot of these deal with the underwriting of shipping arrangements and the like. And if you're going to achieve uniformity and not have it chopped up, you've got to give a little bit of wiggle room and breadth to that congressional grant of admiralty jurisdiction. If you start pulling the noose too tight, you get disuniformity and something that has a very definite national and international component. That may well be, Your Honor, although both Britain and Australia both looked at FFAs in particular and said that they are not maritime in nature under their nation's laws. But I think the point of it is the Supreme Court statement in Kirby is that you have to look very closely at the individual contract to determine whether or not it has maritime character. It is settled, I think, that not everything that has to do with a vessel, not everything that has to do with the maritime business of a company that's engaged in maritime business. If we look so, so closely at the individual contracts, aren't we creating a very litigious inquiry right at the outset of a case? Because all rules don't have to be bright-lined, but sometimes you can be a good traffic cop in the courts if you have a jurisdictional rule with some clarity about it. And if we say, well, some FFAs are maritime in nature and other FFAs are not maritime in nature, we're going to look at this provision, we're going to look at that provision. Then, again, not only do we throw admiralty jurisdiction into some state of confusion, but don't we also burn the litigants' resources with a very particularized jurisdictional inquiry right at the outset of their case? And is that desirable? I guess I have to disagree with that, Your Honor. What the Supreme Court said in Kirby is that you have to take a contract-specific determination as to what's going on in the particular case to decide whether it's maritime in nature or not. As you said in one of your questions to me, if there's an FFA between a speculator… Yeah, I grant you, but that wasn't so much the nature of the contract, but to me it would be important as to which parties were into it. And if there were some people out in Nebraska who were not at all connecting with the shipping industry and were having some sort of futures contract or what have you, it would be a different case. But I don't think that's here. Well, I think that, in fact, in substantial part that is here. As we show in our briefs, and Flame has not really responded, there is strong reason to believe that Flame entered into these particular FFAs for speculative purposes. It is a broker. It is at risk of market prices rising. And nevertheless, it bought FFAs, which increased its exposure to rising prices, which I very strongly suggest that it entered into these agreements for speculative purposes. Thank you. I thought it only fair to give you some extra time because we took a bit of it up with questions. I appreciate that, Your Honor. We appreciate your argument. Mr. Bennett? May it please the Court. My name is William Bennett from the firm of Blank Rum. At Council's table with me is Lauren Wiggison and Nicholas Tambone, and we represent Flame SA. First off, I'd like to just correct something. Flame SA is not a broker. We own and ship coal. The Court's opinion in Vital supports Flame because the dispositive question is not which court issued the judgment, but rather whether the claim itself is maritime in nature, as that term is defined by the Supreme Court in Kirby. Even though a different court has already adjudicated that under foreign law and determined that it is not maritime in nature? There was no adjudication that the FFA was not maritime under English law. There is no case issued out of any English court that says an FFA is not maritime. All right, but your point is it doesn't matter because we don't look... It doesn't matter. It doesn't matter because Judge Kaplan in the Southern District of New York, a very well-experienced jurist dealing with numerous admiralty matters, in the heyday of Rule B, the Southern District of New York was inundated with these types of claims. Judge Kaplan knew when he had our initial request to enforce the judgment with an FFA contract with the English judgment, a full evidentiary review of that document, he said an FFA is a maritime contract. I'm sitting in admiralty. He had subject matter jurisdiction. We brought that judgment down to the Eastern District of Virginia, and under 1963 had that recognized. That does not change the maritime nature. This was a maritime claim. Let me follow up Judge Diaz's question. Let's say that the parties come in, there's a judgment granted in England, and the judgment's domesticated here, and you want to pursue Rule B attachment against the third party. And the parties are in agreement that the English judgment under the laws of England is not a maritime judgment. Hypothetically, it's a maritime judgment in the United States. In that circumstance, you still have admiralty jurisdiction to pursue under Rule B. Without a doubt under Blue Whale. And I'll tell you, Judge, there are three circumstances we're dealing with here that your question goes to. The first circumstance is there's an admiralty judgment issued by a foreign court. Our rule says that our admiralty courts must honor that judgment even if the claim is not maritime in nature under U.S. law for uniformity purposes. The second situation was the situation that Vital dealt with, and that is when the parties agree that regardless of what law applies, it's a maritime claim. The language that- There you're dealing with a claim, not a judgment. Does that matter? It does not matter. Because under Rule B, the issue is procedural question, is it maritime in nature under U.S. law? That's what the decision is. Is the claim itself. A maritime judgment never loses its maritime flavor, so there's an independent basis for subject matter jurisdiction. Rule B, we use all the time- and not be recognized under maritime law here in the U.S. Because Rule B and subject matter jurisdiction are unique to American jurisprudence. But the whole predicate of that is that there's a maritime judgment to begin with to enforce. And we do have that. The Southern District of New York- Well, but getting back to Judge Agee's hypothetical where the parties agree there is no maritime judgment. That's- Well, when we have that, if we're talking about foreign law, that under foreign law there's an agreement that it's not a maritime claim, that doesn't change the analysis here in the United States when dealing with a Rule B. Because Blue Whale tells us that we do not look to foreign law. It's purely a question of procedural law. We look to federal law. We have the Constitution, Article III, Section 2, Clause 1.  Because subject matter jurisdiction is so unique. I recognize the importance of uniformity, but that seems to elevate and denigrate the comedy and respect that we should owe to a foreign judgment where a court has decided that it's not a maritime claim, not a maritime judgment. Well, when we're talking about comedy, are we talking about comedy of nations, or are we talking about full faith and credit comedy between district courts? I agree with you that the principle of comedy is very important, but that does not impinge upon or affect the Constitution. The Constitution in Congress says that the district court can hear any claim, any admiralty claim or maritime claim. So the issue here that the district court wanted guidance on was a very narrow issue. It had nothing to do with the FFA. The court was emphatic that the FFA was a maritime contract. It had a full evidentiary record before it, had declarations, had the contract before it. The New York court. The New York court had the FFA and a declaration from an English solicitor that said, this claim is maritime in nature. The Eastern District of Virginia had multiple declarations attacking whether the FFA is a maritime contract. It had the contract before it, and it had all the decisions of the prior district courts. And Judge Dumas was emphatic that the FFA was a maritime contract. The sole question that he wanted answered on this interlocutory appeal was whether, in a Rule B scenario, do we follow Blue Whale? In light of Vittal, will this court still follow Blue Whale? And Blue Whale and Vittal are in harmony with each other. Vittal did not address this issue that we're here today. When there is speculation about whether a foreign court would deem this a maritime claim, there is no decision by the English courts that the FFA is not a maritime contract. In fact, Judge Clark in the Southern District of Texas in Flame v. Links said that he was unsure. It possibly could be a maritime claim. We had an English solicitor issue an opinion in the Southern District of New York, said that's maritime in nature. So the sole question that was raised by Judge Dumas for this court to decide was when dealing with a Rule B situation, does the court look to the procedural law of the United States? That question was answered by Blue Whale, and it said yes, you must look to the federal law of the United States. Vittal and Blue Whale are clearly in harmony with each other. There is no conflict. There is no tension. In fact, the only tension among all of the cases that were cited by both counsel is the citation to D'Amico by my adversaries. D'Amico makes the bright-line rule that you look to the court that issued the judgment, which Vittal clearly said you do not do. Well, D'Amico was decided after Blue Whale, right? No, Blue Whale was decided after D'Amico, and we believe that it was abrogated. D'Amico is up on appeal right now. I do have some time left, but if the court has no other further questions. Let me ask you a question, though, that goes to the second issue that the opposing counsel raised. Is it your position that as a matter of law, all of these straightforwarding agreements are maritime? I'm thinking of the suggestion of a hypothetical that Judge Wilkinson mentioned. You have hedge fund A and hedge fund B, and they decide, well, this is a good thing we ought to have in our portfolio. No connection otherwise to maritime industry at all. Is that a maritime contract? Whether a contract is maritime in nature is a question of fact, and the decision here by Judge Dumar after looking at all of the evidence was that this particular contract was a maritime contract. This was a contract between a shipper of coal and an owner of a vessel negotiated by the assistance of a ship broker and a ship charterer to set a specific freight rate, a daily specific freight rate, for a specific type of class of vessel, a Panamax vessel, on four different trade routes, three routes leaving the U.S. Gulf and one leaving the Pacific Coast. An FFA is directly connected to maritime commerce. The whole idea of an FFA, which was designed and created to facilitate the dry bulk market, was so that traders of coal and grain and ship owners can insure against fluctuating freight rates, which this court already knows that freight rates are the fundamental component to maritime commerce, and that's what's being protected by an FFA is the risk of fluctuating freight markets. We have, as Judge Wilkinson said, numerous district court judges who have analyzed freight forward agreements in many maritime jurisdictions. They've looked into the facts of the case and determined that an FFA is a maritime contract. It was designed specifically for the shipping market. So is a factual inquiry required in every case? The reason I ask that is that the district court's opinion seems to have contradictory conclusions in the sense that at one point it says that Flames FFAs appears to have been primarily to hedge the risks in their shipping business, but then it also says, which should appear to be a finding of law, this court is not alone in finding that under federal law FFAs are maritime contracts. I think at this point in time that an FFA is a maritime contract under U.S. law. Under all circumstances? Under all circumstances. Okay. But this one is really maritime. Sir, it's got barnacles on it. I mean, there's no other way to say it. This was a coal trader dealing with a ship owner who wanted to set a freight rate. I mean, that's maritime. It's exactly what Kirby said, protect maritime commerce. Freight rates are the cornerstone of maritime commerce. And that factual finding was already made by Judge Dumas. It was made by the Southern District of New York. There's no other further questions. Thank you. Mr. Rothman. Thank you, Your Honor. You've already been very indulgent, if I could just make a couple of very quick points. First, as to the Southern District of New York judgment, that was an action that was brought to recognize the foreign judgment. The order issued by the Southern District was recognition of the foreign judgment. So when we're talking about comedy, it's comedy to the foreign court. This is not an independent federal judgment in New York. This is an English judgment that was recognized in New York. And so we have to look to the English judgment to determine the nature of what was going on there. Second, on the question of whether or not FFAs are entered into purely for speculative purposes, a question that Judge Wilkinson raised, there is no question that they are. The record in this case tells us that they are. You can look at Appendix Pages 183 and 201, where the experts, the only experts in the case who will find this question said very clearly that some FFAs are purely speculative in their purposes. There is also evidence in this case. Look at the appendix at Pages 105 and 206, indicating that Flame's purpose for entering into these FFAs were speculative. They were part of an attempt not to hedge but for speculative purposes. And to the extent that a contract can be maritime in nature only if its purpose is advancing maritime commerce, as the Supreme Court told us in Kirby, that is not good enough. And so at a minimum we think the court stating the right standards should send the case back to Judge Dumour to determine on the record here whether the purpose of these FFAs was maritime commerce on the one hand or speculation on the other. On the question of the nature of English law, which the court asked my opponent about, Judge Dumour was very, very clear that under English law these FFAs were not maritime in nature. We think that is quite clear. The expert testimony in this case is unambiguous on that. And finally, I'll make one final point on the question of whether or not there is some important U.S. interest at stake here. These are foreign parties. It's a foreign judgment that they seek to enforce. It's a foreign vessel. It would not be subject to attachment under the law of England. It's not at all clear why there is a U.S. interest in allowing attachment in Admiralty here. If there's nothing further, Your Honor. Thank you, sir. Great. Thank you so much. We will adjourn court and come down and greet counsel. This honorable court stands adjourned until this afternoon at 2.30. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, G. Steven Agee, Albert Diaz